R. A. RIDDELL, District Director, Internal Revenue, Los Angeles District, Appellant,

v.

CALIFORNIA PORTLAND CEMENT COMPANY, Appellee.

No. 18506.

United States Court of Appeals Ninth Circuit.

April 2, 1964.

John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney and Michael Mulroney, Attys., Dept. of Justice, Washington, D. C., Francis C. Whelan, U. S. Atty. and Loyal E. Keir, Asst. U. S. Atty., Chief Tax Section, Los Angeles, Cal., for appellant.

Musick, Peeler & Garrett, Joseph D. Peeler and Stuart T. Peeler, Los Angeles, Cal., for appellee.

Before BARNES, JERTBERG and KOELSCH, Circuit Judges.

JERTBERG, Circuit Judge:

The prior history of this controversy is fully set out in our opinion in Riddell v. California Portland Cement Company, 297 F.2d 345 (9th Cir. 1962), and need not be repeated here. In that case we noted that the taxpayer had elected to take the pre-kiln seed cutoff point as to all taxable years here involved, pursuant to Public Law 86–781 § 4, 74 Stat. 1017, 1018, 26 U.S.C. § 613 note. We remanded the cause to the district court "for the making of new findings and conclusions, and the entry of a judgment consistent with the teachings of [United States v. Cannelton Sewer Pipe Co., 364 U.S. 76 [80 S.Ct. 1581, 4 L.Ed.2d 1581] (1960)] and with this opinion * * * and with the election made by California Portland Cement Company." Upon remand the district court held that, in computing the

taxpayer's gross income from mining (its percentage depletion base) by the proportionate profits method, prescribed in the pertinent Treasury Regulations, for the limestone mined by the taxpayer and used to make cement and cement clinker, the costs of iron ore and quartzite added to the limestone are to be treated as mining costs. This appeal is from that holding.

The undisputed facts, so far as pertinent here, are as follows. In the taxable years in question, the taxpayer extracted limestone from its Colton Quarry and used it to make cement clinker and finished cement. The taxpayer took the following steps in producing cement from its limestone and preparing the cement for marketing: (1) quarrying and primary crushing of the limestone; (2) secondary crushing, grinding and blending of the crushed limestone with varying amounts of iron ore and quartzite to obtain a properly proportioned raw mixture which is stored in silos pending further processing; (3) dead burning the raw mixture in rotary kilns to produce cement clinker which is stored in piles pending further processing or sale; (4) grinding the clinker with the addition of other materials; and (5) storing the resultant finished cement in silos, and preparing the cement for shipment in bulk or sack to customers.

The addition of iron ore and quartzite to the limestone (step 2) was an essential step in the production of cement clinker and finished cement from the taxpayer's limestone. All of the quartzite was purchased by the taxpayer; all of the iron ore was extracted by the taxpayer from its own iron ore deposit. For all of this iron ore, the taxpayer received a depletion allowance separate and apart from its depletion allowance on limestone.

The taxpayer's limestone is subject to percentage depletion at the rate of 10 percent of its "gross income from mining." The district court used the method for constructively computing the "gross income from mining" which is commonly called the proportionate profits method, reflected in the following formula:

$$\frac{\text{``mining'' costs}}{\text{total costs of product sold}} \times \frac{\text{sale price of}}{\text{product sold}} = \frac{\text{gross income}}{\text{from mining.}}$$

By virtue of taxpayer's election, the pre-kiln feed stage is to be used as the cutoff point to "mining" in determining the "mining costs" factor of that formula, as now provided in 26 U.S.C. § 613, the pertinent parts of which are reproduced in the footnote.[1] The question presented concerns the scope of "Treatment processes considered as mining" within the meaning of that provision. The addition of quartzite and iron ore to limestone encompasses two costs: (1) the cost of the additives themselves, which covers the purchase price of the quartzite and the

I. "§ 613.

　　*　　　*　　　*　　　*　　　*

"(c) Definition of gross income from property.—For purposes of this section—

　　*　　　*　　　*　　　*　　　*

"(2) Mining.—The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto), * * *.

　　*　　　*　　　*　　　*　　　*

"(4) Treatment processes considered as mining.—The following treatment processes where applied by the mine owner or operator shall be considered as mining to the extent they are applied to the ore or mineral in respect of which he is entitled to a deduction for depletion under section 611:

　　*　　　*　　　*　　　*　　　*

"(F) in the case of calcium carbonates and other minerals when used in making cement—all processes (other than preheating of the kiln feed) applied prior to the introduction of the kiln feed into the kiln, but not including any subsequent process;"

cost of mining the iron ore; and (2) the cost, or expense of physically adding those minerals to the limestone. The appellant concedes that the second—the act of physically adding the quartzite and iron ore to the limestone—is a pre-kiln "process" and that the expense thereof is a "mining" cost.

In our view the costs of the additives themselves are not includable as a "mining" cost. The district court was of the erroneous view that of the total cost of bulk cement production, so much as relates to the pre-kiln stage represents "mining" within the formula, and that the cost of these additives were includable simply because they were added to the limestone prior to the kiln stage. The legislative history of the provision in question reveals the error.

S.Rep.No.1910, 86th Cong., 2d Sess., pp. 7–10, explains that the cutoff point for cement-producing minerals is derived from Rev.Rul. 290, 1953–2 Cum.Bull. 41, which provides:

"Blending with other materal after crushing and grinding such as that occurring at the kiln feed bins, is excluded from 'ordinary treatment processes' * * *.

"The gross income for percentage depletion purposes must of course be computed separately with respect to each component mineral, notwithstanding any such mixing."

We believe that by the enactment of the amendment in question Congress intended only to move the cutoff point from the crushing and grinding stage to the pre-kiln stage, but not to alter the revenue ruling with respect to separate computations of depletion of component minerals. To hold otherwise would be to allow a double depletion on the iron ore extracted by the taxpayer. This will not do.[2]

With respect to the quartzite, H.Conference Rep.No.2005, 86th Congress, 2d Sess., pp. 8–9 (1960–2 Cum.Bull. 741, 746), U.S.Code Congressional and Administrative News 1960, p. 2581 contains the following:

"As under existing law, a described process is to be treated as mining where performed by another person for the mine owner or operator if the mine owner or operator has not disposed of his depletable interest in the ore or mineral to which such process is applied. Under the language of this provision, a described process is not treated as mining where applied to a purchased ore or mineral."

If inclusion of iron ore extracted by taxpayer is improper, *a fortiori* inclusion of quartzite purchased from someone else is improper. Taxpayer has no "economic interest" in the quartzite.[3]

It will be noted that § 613(c) (4) is concerned with "treatment processes * * * *applied* to the * * * mineral." (Emphasis added.) A number of "treatment processes" are described in the provision. "Cleaning, breaking, sizing, dust allaying" coal; "cleaning, pumping to vats, cooling, breaking, and loading for shipment" sulfur recovered by the Frasch process; "pulverization" of talc; "burning" of magnesite; and "sintering and nodulizing" of phosphate rock, are illustrative examples of the processes described. "Extracting" and "purchasing" additives are not representative of the "treatment processes * * * applied to the * * * mineral" described in the statute.

The depletion allowance sought here is in respect of limestone. Under the Cannelton doctrine, "mining" ceases at the crushing stage. Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct.

2. Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 55 S.Ct. 174, 79 L.Ed. 383 (1934).

3. See Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959).

378, 9 L.Ed.2d 492 (1963).[4] The Congress granted relief from this rule by including treatment processes applied to the mineral up to the kiln-feed stage. Surely Congress did not mean to grant the additional relief of allowing depletion upon minerals already depleted or in which the taxpayer had but an "economic advantage."[5]

Finally, appellee urges as follows:

"If for any reason this court is unable to adopt the method of computation reflected in the decision below, then in the alternative it should adopt the proportionate tonnage method of account for additives."

The alternative method was presented to the district court in the course of argument in the proceedings appealed from, but the court made no findings or conclusions in respect thereto. The government urges that the alternative method is improper where there is no representative market price of like kind and grade at the cutoff point. The district court made specific findings that there was no commercial market for any mineral product of like kind and grade at the cutoff point. (Findings Nos. 5 to 12 inclusive.) Appellee makes no challenge to these findings. The alternative method is scantily treated in the briefs. In these circumstances we decline to attempt or to consider the alternative method. Whether, on remand, the district court should reconsider the alternate method in light of the findings and pertinent treasury regulations is a matter resting within its province.

Judgment is reversed and remanded for further proceedings not inconsistent with the views herein expressed.

---

4. Our decision in Monolith Portland Cement Company v. United States, 269 F. 2d 629 (9th Cir. 1959), permitted the inclusion of costs of additives in determining the costs of the first commercially marketable product produced by applying ordinary treatment processes to limestone. This holding proceeded upon the assumption, not challenged by the United States in that case, that the depletion base was the finished product—cement. The Cannelton holding, decided there-

after, eliminated that premise, relying upon the purpose of the depletion allowance: "Depletion, as we have said, is an allowance for the exhaustion of capital assets." 364 U.S. at 86, 80 S.Ct. at 1587, 4 L.Ed.2d 1581. In view of the subsequent judicial and legislative history, we do not feel bound by our 1959 Monolith decision.

5. Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897 (1938).